

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

ENTERED
01/31/2017

| | |
|---|---|
| IN RE | ) |
| | ) |
| WINDMILL RUN ASSOCIATES, LTD., | ) CASE NO. 15-80319-G3-11 |
| | ) |
| Debtor, | ) |
| | ) |
| WINDMILL RUN ASSOCIATES, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) ADV. NO. 15-8013 |
| | ) |
| FEDERAL NATIONAL MORTGAGE | ) |
| ASSOCIATION, AND OAK GROVE | ) |
| COMMERCIAL MORTGAGE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>MEMORANDUM OPINION</u>

The court has held a joint trial on the above captioned
adversary proceeding, and in the instant Chapter 11 case, the
"Amended Motion for (I) Allowance of Secured Claim and Reasonable
Fees, Costs, and Charges Pursuant to 11 U.S.C. § 506(b) and Fed.
R. Bankr. P. 2016 and (ii) Estimation of Future Costs Pursuant to
11 U.S.C. § 502(c)" (the "506(b) motion") (Docket No. 279,
amending Docket No. 276, Case No. 15-80319-G3-11).

<u>Introduction</u>

Part of the statutory mandate of the Federal National
Mortgage Association (generally known as "Fannie Mae") is to
encourage investment in construction and management of low to
middle income housing. <u>See</u> 12 U.S.C. § 1716(c). This

encouragement is created through tax credits, administered for the United States Department of Housing and Urban Development by each state's allocating agency.  These properties financed through Low Income Housing Tax Credits ("LIHTC") are ordinarily marketed to groups composed of financial institutions and individual investors seeking the specified tax benefit.  The dedication of property in Texas for low to middle income housing is accomplished through a Land Use Restriction Agreement ("LURA") with the Texas Department of Housing and Community Affairs ("TDHCA").

The Debtor in the instant case built and managed an apartment complex subject to a LURA in Sweeny, Texas, consisting of 76 three- and four-bedroom units in 19 single story buildings, in a garden style, with paths and shrubbery.

Beginning in approximately 2010, Oak Grove Commercial Mortgage ("Oak Grove"), a private, for-profit, business servicing Debtor's debt on behalf of Fannie Mae pursuant to a contract that is not before the court, made ever-increasing demands for repairs on the property.

On the surface, the dispute between Debtor on one side, and Fannie Mae and Oak Grove on the other side, appeared to involve two basic issues:  The scope of repairs necessary for the property, and whether funds to make those repairs were to be held and disbursed by Oak Grove or by Debtor or Debtor's principals.

However, although the Debtor was never in default on payments of principal and interest under the loan, Oak Grove and Fannie Mae worked together in bad faith to drive toward a foreclosure of Debtor's interest in the property.  This drive was not motivated solely by a desire to ensure that the property was well-maintained.  Rather, Fannie Mae and Oak Grove perceived an opportunity to remove the property from the restrictions of the LURA, and to trigger recourse liability for the Debtor's principals, by foreclosing.  This would increase the value of the property by enabling the new owner of the property to charge market rents.  Oak Grove previously has foreclosed on Fannie Mae properties in Kentucky and Oklahoma, both of which were current on principal and interest, but as to which some problem other than staying current on principal and interest was perceived by Oak Grove to justify foreclosure.  Individuals working for Fannie Mae and Oak Grove frequently testified at this trial as to their seeking to serve low income tenants.  However, their actions drove toward foreclosure, on a note that was current on principal and interest, and foreclosure would have abolished the LURA which assured availability of apartments to low income tenants.

Fannie Mae posted the property for a foreclosure sale to take place on September 1, 2015.  The posting for foreclosure led to Debtor's filing of the petition in the instant Chapter 11 case.  Fannie Mae expected to recover its costs from Debtor under

3

the loan documents.

After the filing of the bankruptcy case, Fannie Mae and Oak Grove focused on litigation rather than negotiation, resulting in costs to Debtor, as well as to Oak Grove and Fannie Mae, that were out of proportion to the amount in controversy.

The court has considered the pleadings; the docket sheets in the instant adversary proceeding and Chapter 11 case, of which the court takes judicial notice; the testimony of the witnesses, developed over 25 days of trial; the documentary evidence; and the memoranda of law submitted by the parties. The following are the Findings of Fact and Conclusions of Law of the court. A separate conforming Judgment will be entered. To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Table of Contents</u>

1.   Findings of Fact
     A.   Formation of Debtor
     B.   LURA
     C.   Loan Documents
          1.   Note
          2.   Deed of Trust
          3.   Replacement Reserve and Security Agreement
          4.   Assignment
     D.   Servicing Relationship
     E.   Prepetition Course of Dealing Among the Parties
          1.   Prior to Pre-Negotiation Letter
          2.   First Pre-Negotiation Letter
          3.   The Push Toward Foreclosure
     F.   Overview of the Chapter 11 Case

      G.    Fannie Mae's Motion For Relief From Stay
      H.    Plan and DIP Financing Negotiations
      I.    The Confirmed Plan
      J.    Post-Confirmation Operations
      K.    The Pleadings in the Instant Adversary Proceeding
           1.  Debtor's Complaint
           2.  Defendants' Answer and Fannie Mae's Counterclaim
           3.  Windmill's Answer to Fannie Mae's Counterclaims
      L.    Postpetition Matters
           1.   The 506(b) Motion
           2.  Debtor's Objection to the 506(b) Motion
      M.    Testimony as to the 506(b) Motion
           1.  Keith Aurzada, of Bryan Cave
           2.  Brian Kilmer, of KCW
      N.    Credibility of Witnesses
2.  Conclusions of Law
      A.    Jurisdiction and Authority to Enter Final Orders
      B.    Preference
      C.    Standing
      D.    Breach of Contract
           1.   Valid Contract
           2.   Performance or Tendered Performance
           3.   Breach
           4.   Damages
                a.   To the Extent of Defendants' Breach
               b.   To the Extent of Debtor's Breach
      E.    Declaratory Judgment
      F.    Claim Objection
      G.    The 506(b) Motion

           1.  Attorney Fees
                a.   The Motion for Relief from Stay
               b.   DIP Financing, Plan, and Disclosure Statement
           2.  Expert Witness Fees
           3.  "Miscellaneous Fees"
           4.  Postpetition Interest
           5.  Summary of 506(b) Claim

<u>Findings of Fact</u>

Windmill Run Associates, Ltd. ("Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 29, 2015. Debtor owns and operates the 76-unit Windmill Run apartment complex as a Low Income Housing Tax Credit

("LIHTC") property, in Sweeny, Texas.  Debtor's Chapter 11 plan
was confirmed, by order entered on August 15, 2016.  (Docket No.
267, Case No. 15-80319-G3-11).

A.   Formation of Debtor

Debtor was formed through a series of agreements
between Frank Fonseca, Mark Walther, National Partnership
Investments Corp. ("NAPICO"), and various of their affiliates.
Prior to the formation of Debtor, Fonseca had previously worked
at NAPICO, which was a syndicator of LIHTC properties.  (Tr.
11/18/2016, at p. 11).[1]  Fonseca headed NAPICO's asset management
department, overseeing NAPICO's portfolio of approximately 10,000
LIHTC apartment units.  (Tr. 11/18/2016, at p. 11-12).  After
Fonseca left NAPICO, he and Walther formed American Communities,
an entity which develops apartment complexes, primarily LIHTC
properties.  (Tr. 11/18/2016, at p. 18).  Fonseca testified that
American Communities has developed approximately 1,000 apartment
units.  (Tr. 11/18/2016, at p. 19).  He testified that the

---

[1]Mark Breen, who worked with Fonseca at NAPICO, and has been
at various times through his entities an equity holder,
guarantor, developer, and active in management of the Debtor,
testified that syndicators of LIHTC properties raise money from
investors, in exchange for providing those investors with the tax
credits, the losses generated through depreciation, and a portion
of the cash flow from the project.  (Tr. 12/12/2016, at p. 38).
He testified that syndicators get notice under loan documents
associated with LIHTC properties because they have a fiduciary
duty to their investors to make sure they receive the tax
credits, and because they must set aside a reserve account to
handle material and non-material events that could affect the
property, such as tax recapture.  (Tr. 12/12/2016, at p. 36-37).

Windmill Run apartment complex was American Communities' first development. (Tr. 11/18/2016, at p. 18).

In the agreements forming Debtor, Windmill Run Development, Inc., an entity owned by Fonseca and Walther, became the operating general partner of the Debtor entity. National Corporate Tax Credit Inc. X ("NCTC X") became the administrative general partner of the Debtor entity.[2] National Corporate Tax Credit Fund X ("NCTC Fund X") became the limited partner of the Debtor entity. (Windmill Exhibit 38).[3] NCTC Fund X was an entity administered by NCTC X, and syndicated to investors by NAPICO. (Tr. 11/18/2016, at p. 20). NCTC X was a NAPICO entity. (Tr. 11/18/2016, at p. 20). Fonseca testified that the tax benefits generated by the property were to flow to the investors in NCTC Fund X. (Tr. 11/18/2016, at p. 20). Fonseca testified that NAPICO holds a nominal ownership interest in the Debtor. (Tr. 11/21/2016, at p. 124).

Breen testified that he was the construction company, part of the development company, and gave guaranties to the tax credit investors with respect to the completion and initial

---

[2]In a 2002 amendment to the partnership agreement, NCTC X withdrew as administrative general partner, and was readmitted as administrative limited partner. (Windmill Exhibit 39).

[3]The exhibits marked such as "Windmill Exhibit 1" are those which appeared in the exhibit book prepared by Debtor in Adversary No. 15-8013. Debtor's exhibits with respect to the 506(b) motion are marked such as "Windmill Exhibit 1 - 506(b)."

leasing of the property.[4]   (Tr. 12/12/2016, at p. 32).

During December, 2000, Debtor and the Texas Department of Housing and Community Affairs ("TDHCA") executed a "Declaration of Land Use Restrictive Covenants for Low-Income Housing Credits" ("LURA").  The parties have stipulated that the LURA was filed in the real property records of Brazoria County, Texas on December 29, 2000.  (Docket No. 80, Adv. No. 15-8013, at Exhibit 1, Fact No. 2).

On December 18, 2002, Debtor closed on permanent financing of the apartment complex.  Debtor executed a note payable to Midland Mortgage Investment Corp. ("Midland Mortgage"), in the original principal amount of $2,024,000.  (Windmill Exhibit 15).

Effective as of January 1, 2012, Debtor amended its partnership agreement, with Windmill Venture, LLC taking over as the administrative partner of Debtor, in place of NCTC X and NCTC Fund X.[5]  (Windmill Exhibit 40). Fonseca testified that Windmill

---

[4]The court infers from Breen's use of the word "company," that Breen's entities, rather than Breen individually, performed some of these functions.  Breen testified that, after the closing of the permanent financing, Breen was not actively involved in Debtor's management until 2015.  (Tr. 12/12/2016, at p. 48).  As further addressed below, an entity in which Breen holds an ownership interest purchased the limited partnership interest of NCTC X and NCTC Fund X in 2012.

[5]The original document (Windmill Exhibit 40) identified Windmill Venture, LLC as the "administrative general partner."  A subsequent correction document (Windmill Exhibit 41), executed in February, 2016, identifies Windmill Venture, LLC as the

Venture, LLC is owned by Breen, Fonseca, and Walther.  (Tr.
11/18/2016, at p. 19).  Breen testified that he repurchased an
interest in the Debtor, through the 2012 transaction, because the
compliance period under the LURA was nearing completion.  (Tr.
12/12/2016, at p. 47).  Breen testified that he acquires
properties that are near the end of the compliance period,
rehabilitates the properties, and puts them back into service as
LIHTC properties with new syndicated tax credits.  (Tr.
12/12/2016, at p. 44).

    B.   <u>LURA</u>

       Section 4 of the LURA provides that the project owner
covenants that at least 40 percent of the units will continuously
be maintained as both rent-restricted and occupied by individuals
whose income is 60 percent or less of the area median gross
income.  (Windmill Exhibit 3).

       Section 5(a) of the LURA terminates the LURA after a 15
year compliance period and an additional 15 year extended use
period.  (Windmill Exhibit 3).

       Section 5(b)(1) of the LURA provides that the LURA
terminates with respect to each building on the date the building

---

"administrative limited partner."  Fonseca testified that the
identification of Windmill Venture, LLC in the 2012 amendment at
Windmill Exhibit 40 was an error, containing language from a
prior template.  He testified that the error was discovered after
Fannie Mae filed suit against Fonseca.  (Tr. 11/21/2016, at p.
73-75).

is acquired by foreclosure, or instrument in lieu of foreclosure, unless the Secretary of the Treasury of the United States determines that the acquisition is part of an arrangement with the taxpayer the purpose of which is to terminate the LURA. (Windmill Exhibit 3).

Breen signed the LURA on behalf of Debtor, as its vice president, on December 22, 2000.  (Windmill Exhibit 3).

Fonseca testified that tax credit recapture occurs where there is a failure to comply with the LURA.  If there is a failure to comply during a compliance period, investors generally must repay the tax benefits they have obtained.  (Tr. 11/18/2016, at p. 16).  Fonseca testified that neither he, nor Breen or Walther, have obtained any of the tax benefits from operation of the property.  (Tr. 11/18/2016, at p. 17).

Fonseca testified that, while he was at NAPICO, NAPICO would monitor its tax recapture exposure, even after its investors were "out of the deal."  (Tr. 11/21/2016, at p. 4).  He testified that a potential tax recapture liability during 2015 to the entities which received a tax benefit with respect to the Windmill Run property would have required the entities which received a tax benefit to write a check to the Internal Revenue Service in an amount of approximately $300,000.  (Tr. 11/21/2016, at p. 126-127).

C.   Loan Documents

The loan documents for the December 18, 2002 transaction included, _inter alia_, a note (Windmill Exhibit 15), a deed of trust (Defendants Exhibit 2), and a "Replacement Reserve and Security Agreement" ("RRSA") (Defendants Exhibit 3).[6].

1.   Note

The note provides in pertinent part in the preamble for an initial principal amount of $2,024,000, and an interest rate of 6.58 percent.  Paragraph 1 defines "Lender" to mean the holder of the note.  Paragraph 3(b) requires the borrower to pay monthly installment payments of $12,899.73, and sets a maturity date of January 1, 2021.  Paragraph 9 provides that it is nonrecourse as to the borrower unless the occurrence of, _inter alia_ at Paragraph 9(c), "a Transfer that is an Event of Default under Section 21 of the Security Instrument."  Paragraph 10(a)(2) requires the borrower to pay, upon the Lender's exercise of any right of acceleration under the note, "the prepayment premium calculated pursuant to Schedule A."  Paragraph 11 requires the borrower to pay:

> [A]ll expenses and costs, including fees and out-of-
> pocket expenses of attorneys and expert witnesses and
> costs of investigation, incurred by Lender as a result

---

[6]An additional document, a "Completion/Repair Security Agreement," was addressed in the testimony.  (_See_ Tr. 11/1/2016, at p. 114, 117; Tr. 11/3/2016, at p. 5-6).  It is not in evidence, and does not appear to be central to the dispute before the court.

of any default under this Note or in connection with
efforts to collect any amount due under this Note, or
to enforce the provisions of any of the other Loan
Documents, including those incurred in post-judgment
collection efforts and in any bankruptcy proceeding
(including any action for relief from the automatic
stay of any bankruptcy proceeding) or judicial or non-
judicial foreclosure proceeding.

(Windmill Exhibit 15).

Paragraph 13 of the note provides, _inter alia_, that the
borrower and the key principals waive notice of demand and of
notice of acceleration.   (Windmill Exhibit 15).

An "Acknowledgment and Agreement of Key Principal to
Personal Liability for Exceptions to Non-recourse Liability"
attached to the note obligates persons identified as "Key
Principals" to pay any amount for which the borrower is
personally liable under Paragraph 9 of the note.   Fonseca and
Walther signed as Key Principals.   Schedule A identifies a
formula for calculation of a prepayment premium.   (Windmill
Exhibit 15).

2.   Deed of Trust

The deed of trust, in the preamble, conveys the
property as security for the borrower's obligations to repay the
debt, and to perform all the covenants and agreements of the
borrower under the loan documents.   Section 1(p) defines "Lender"
as the entity identified as the Lender in the first paragraph of
the deed of trust (which is identified as Midland Mortgage
Investment Corporation), and its successors and assigns, or any

subsequent holder of the note.  Section 1(r) defines "Loan

Servicer" as:

> [T]he entity that from time to time is designated by
> Lender to collect payments and deposits and receive
> notices under the Note, this Instrument and any other
> Loan Document, and otherwise to service the loan
> evidenced by the Note for the benefit of Lender.
> Unless Borrower receives notice to the contrary, the
> Loan Servicer is the entity identified as "Lender" in
> the first paragraph of this Instrument.

(Defendants Exhibit 2).

Section 1(s)(12) of the deed of trust defines

"Mortgaged Property" to include, inter alia, "all Imposition

Deposits."  Imposition Deposits are defined in Section 7(a) of

the deed of trust, which provides:

> 7. DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.
>
> (a) Borrower shall deposit with Lender on the day
> monthly installments of principal or interest, or both,
> are due under the Note (or on another day designated in
> writing by Lender), until the Indebtedness is paid in
> full, an additional amount sufficient to accumulate
> with Lender the entire sum required to pay, when due
> (1) any water and sewer charges which, if not paid, may
> result in a lien on all or any part of the Mortgaged
> Property, (2) the premiums for fire and other hazard
> insurance, rent loss insurance and such other insurance
> as Lender may require under Section 19, (3) Taxes, and
> (4) amounts for other charges and expenses which Lender
> at any time reasonably deems necessary to protect the
> Mortgaged Property, to prevent the imposition of liens
> on the Mortgaged Property, or otherwise to protect
> Lender's interests, all as reasonably estimated from
> time to time by Lender.  The amounts deposited under
> the preceding sentence are collectively referred to in
> this Instrument as the "Imposition Deposits".
>
> The obligations of Borrower for which the Imposition
> Deposits are required are collectively referred to in
> this Instrument as "Impositions".  The amount of the

> Imposition Deposits shall be sufficient to enable
> Lender to pay each Imposition before the last date upon
> which such payment may be made without any penalty or
> interest charge being added.  Lender shall maintain
> records indicating how much of the monthly Imposition
> Deposits and how much of the aggregate Imposition
> Deposits held by Lender are held for the purpose of
> paying Taxes, insurance premiums and each other
> obligation of Borrower for which Imposition Deposits
> are required.  Any waiver by Lender of the requirement
> that Borrower remit Imposition Deposits to Lender may
> be revoked by Lender, in Lender's discretion, at any
> time upon notice to Borrower.

(Defendants Exhibit 2).

> Section 7(e) of the deed of trust provides:

> If an Event of Default has occurred and is continuing,
> Lender may apply any Imposition Deposits, in any
> amounts and in any order as Lender determines, in
> Lender's discretion, to pay any Impositions or as a
> credit against the Indebtedness.  Upon payment in full
> of the Indebtedness, Lender shall refund to Borrower
> any Imposition Deposits held by Lender.

(Defendants Exhibit 2).

> Section 8 of the deed of trust provides:  "Borrower

shall deposit with Lender such amounts as may be required by any

Collateral Agreement and shall perform all other obligations of

Borrower under each Collateral Agreement."  (Defendants Exhibit

2).

> Section 17(a) of the deed of trust provides:

> 17. PRESERVATION, MANAGEMENT AND MAINTENANCE OF
> MORTGAGED PROPERTY.

> (a) Borrower (1) shall not commit waste or permit
> impairment or deterioration of the Mortgaged Property,
> (2) shall not abandon the Mortgaged Property, (3) shall
> restore or repair promptly, in a good and workmanlike
> manner, any damaged part of the Mortgaged Property to

the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (4) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, (5) shall provide for professional management of the Mortgaged Property by a residential rental property manager satisfactory to Lender under a contract approved by Lender in writing, and (6) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument.  Borrower shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

(Defendants Exhibit 2).

Section 21 of the deed of trust identified, _inter alia_, as events of default:  a transfer of a controlling interest in the borrower; or a transfer of all or any part of the key principals' interest in the borrower (other than a limited partnership interest).  (Defendants Exhibit 2).

Section 22 of the deed of trust identified, _inter alia_, as events of default:

(a) any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan Document;

* * *

(e) any Event of Default under Section 21;

* * *

15

(g) any failure by Borrower to perform any of its
obligations under this Instrument (other than those
specified in Sections 22(a) through (f)), as and when
required, which continues for a period of 30 days after
notice of such failure by Lender to Borrower, but no
such notice or grace period shall apply in the case of
any such failure which could, in Lender's judgment,
absent immediate exercise by Lender of a right or
remedy under this Instrument, result in harm to Lender,
impairment of the Note or this Instrument or any other
security given under any other Loan Document;

(h) any failure by Borrower to perform any of its
obligations as and when required under any Loan
Document other than this Instrument which continues
beyond the applicable cure period, if any, specified in
that Loan Document.

(Defendants Exhibit 2).

Section 24(b) of the deed of trust provides that the

forbearance by the lender of exercising any of its remedies under

the loan documents shall not be a waiver of or preclude the

exercise of any other right or remedy.   (Defendants Exhibit 2).

Section 32 of the deed of trust provides that the note

may be sold, and that the Loan Servicer may be changed, with or

without sale of the note.   (Defendants Exhibit 2).

Section 39 of the deed of trust provides:

39. LOAN SERVICING. All actions regarding the servicmg
of the loan evidenced by the Note, including the
collection of payments, the giving and receipt of
notice, inspections of the Property, inspections of
books and records, and the granting of consents and
approvals, may be taken by the Loan Servicer unless
Borrower receives notice to the contrary.  If Borrower
receives conflicting notices regarding the identity of
the Loan Servicer or any other subject, any such notice
from Lender shall govern.

(Defendants Exhibit 2).

16

Section 43 of the deed of trust provides, <u>inter alia</u>, that at any time during the existence of an event of default, the Lender may accelerate the note, declaring the debt immediately due and payable. (Defendants Exhibit 2).

The deed of trust contains an "Exhibit B," which modifies the note and the deed of trust. Paragraph 1 of Exhibit B adds the following language as Paragraph 31(d) of the note:

> (d) Lender agrees that effective notice to Borrower under this Instrument and the Loan Documents shall require delivery of a copy of such notice to the Equity Investor. Such notice shall be given in the manner provided in this Section, at the Equity Investor's address set forth below:
>
> NAPICO
> 9090 Wilshire Boulevard
> Suite 201
> Beverly Hills, California 90211
> Attention: Peter Stoughton

(Defendants Exhibit 2).

Paragraph 2 of Exhibit B to the deed of trust adds, <u>inter alia</u>, the following Paragraph 54 to the deed of trust:

> 54. RECOURSE LIABILITY. The provisions of Paragraph 9(c) of the Note, as they relate to Events of Default described in Paragraphs 9(c)(1) and 9(c)(2), shall be operative only after the Equity Investor has been given 30 days notice of the applicable Event(s) of Default described in Paragraphs 9(c)(1) and 9(c)(2), together with an opportunity within such 30-day period to remedy the applicable Event(s) of Default. In all events, Lender shall be entitled during such 30-day period to exercise all of its rights and remedies under this Instrument upon the occurrence of such Event of Default other than foreclosure of the Mortgaged Property.

(Defendants Exhibit 2).

3.   <u>Replacement Reserve and Security Agreement</u>

Paragraph 1 of the RRSA requires that the borrower deposit $1,482 per month with the lender designated as a "Replacement Reserve."  (Defendants Exhibit 3).

Paragraph 2 of the RRSA provides:

> 2.  Loans with Terms Over 10 Years.  If the Loan term exceeds 10 years, then, no earlier than the 6th month and no later than the 9th month of the year which commences on the 10th anniversary of the date of this Agreement (and the 20th anniversary of the date of this Agreement if the Loan term exceeds 20 years), a physical needs assessment shall be performed on the Property by Lender at the expense of Borrower, which expense may be paid of [sic] out of the Replacement Reserve. If determined necessary by Lender, after review of the physical needs assessment, Borrower's required Monthly Deposits to the Replacement Reserve set forth shall be adjusted for the remaining Loan term so that the Monthly Deposits will create a Replacement Reserve that will in Lender's determination, be sufficient to meet required Replacements (defined below).

(Defendants Exhibit 3).

Paragraph 3(a) of the RRSA provides that the borrower assigns the Replacement Reserve to the lender as additional security for the borrower's obligations under the loan documents. Paragraph 3(b) of the RRSA provides for the lender to make disbursements from the Replacement Reserve to reimburse the borrower for the costs of those items listed on Exhibit A to the RRSA, defined as "Replacements."  Exhibit A of the RRSA identifies the items covered as dishwashers, countertops, carpeting, roadways, pool/spa equipment, pool/spa plaster, common

18

area carpet, and exterior walls, wood/stucco.   (Defendants
Exhibit 3).

Paragraph 4 of the RRSA provides for disbursements from
the Replacement Reserve upon written request from the borrower,
after completion of the replacement for which reimbursement is
sought.   (Defendants Exhibit 3).

Paragraph 5.1 of the RRSA provides in pertinent part:

5.1 Workmanlike Completion

(a) Borrower shall make each Replacement when required
in order to keep the Property in good order and repair
and in a good marketable condition and to keep the
Property or any portion thereof from deteriorating.
Borrower shall complete all Replacements in a good and
workmanlike manner as soon as practicable following the
commencement of making each such Replacement.

(b) Lender shall have the right to approve all
contracts or work orders with materialmen, mechanics,
suppliers, subcontractors, contractors or other parties
providing labor or materials in connection with the
Replacements.   Upon Lender·s request, Borrower shall
assign any contract or subcontract to Lender.

* * *

(d) If at any time during the term of the Loan, Lender
determines that replacements not listed on Exhibit A
are advisable to keep the Property in good order and
repair and in a good marketable condition, or to
prevent deterioration of the Property (the "Additional
Replacements") Lender may send Borrower written notice
of the need for making such Additional Replacements.
Borrower shall promptly commence making such Additional
Replacements in accordance with all the requirements of
the Security Instrument.   Reimbursement from the
Replacement Reserve for such Additional Replacements
shall not be made unless Lender has determined to do so
pursuant to Section 4(f). Except for Section 4, all
references in this Agreement to "Replacements" shall
include the "Additional Replacements."

19

(Defendants Exhibit 3).

Paragraph 6.1 of the RRSA provides that a default under the RRSA which is not cured within 10 days after notice from the lender is a default under the "Security Instrument," which is defined in Paragraph B of the preamble to be the deed of trust. Paragraph 6.2 provides that upon default, the lender may use the Replacement Reserve for any purpose, including repayment of the debt, the prepayment premium, or reimbursement of losses and expenses, including reasonable attorney fees. (Defendants Exhibit 3).

Paragraph 10 of the RRSA provides that if the balance of the Replacement Reserve is less than the current estimated cost to make the replacements required by the lender, the borrower shall deposit the shortage within 10 days of request by the lender.  (Defendants Exhibit 3).

    4.  <u>Assignment</u>

On December 18, 2002, Midland Mortgage Investment Corporation executed an assignment to Fannie Mae[7] of all of its beneficial interest under the note, deed of trust and other loan documents.  The assignment was filed in the real property records

---

[7]Noakes testified that Fannie Mae is a name used by the Federal National Mortgage Association.  He testified that Fannie Mae has not filed an assumed name certificate in Texas or in Brazoria County, Texas.  (Tr. 11/1/2016, at p. 41-42).  The assignment identified the transferee as "Fannie Mae," not as FNMA.

of Brazoria County, Texas on December 19, 2002.  (Defendants Exhibit 4).

    D.   <u>Servicing Relationship</u>

       The loan servicing agreement between Fannie Mae and Oak Grove is not in evidence.  Fannie Mae withheld its production to Debtor during discovery, and vehemently objected to its production, in pretrial hearings and at trial, on grounds it contains confidential information, such as pricing agreements as between Fannie Mae and Oak Grove.  (<u>See</u>, <u>e.g.</u>, Tr. 11/8/2016, at p. 20).

       Jim Noakes, a senior asset manager for Fannie Mae, testified that Defendant Oak Grove Commercial Mortgage ("Oak Grove") became the servicer for Fannie Mae of its loan to Debtor. (Tr. 11/1/2016, at p. 32).  Noakes testified that Oak Grove services the loan under contract with Fannie Mae.  (Tr. 11/1/2016, at p. 64).  Noakes testified that he does not know whether Oak Grove acts on Fannie Mae's behalf when it acts as servicer.  (Tr. 11/1/2016, at p. 64).  Noakes admitted that a statement by Oak Grove, in correspondence from Oak Grove to Debtor, that Oak Grove represents Fannie Mae in connection with the loan, is a truthful statement.  (Tr. 11/1/2016, at p. 68).

       Noakes testified that Oak Grove is in charge of billing, invoicing, collecting payments, and dealing with the borrowers; collecting escrows; and monitoring, maintaining and

disbursing funds from escrow.  (Tr. 11/8/2016, at p. 19).

Bill Johnson testified that he is a vice president and special asset manager with Oak Grove, which is now known as Jones Lang LaSalle ("JLL").  (Tr. 11/28/2016, at p. 52).  Johnson testified that he previously was employed by MMA (which had acquired Midland Mortgage, the originator of Debtor's loan)[8] from 2005 through 2008.  (Tr. 12/1/2016, at p. 98).  Johnson testified that, prior to working with MMA, he worked for a tax credit developer beginning in 1988.  (Tr. 12/1/2016, at p. 98).

Johnson testified that he was first assigned a role as to the Windmill Run property in 2005.  (Tr. 12/1/2016, at p. 105).  Johnson testified that he began working at Oak Grove in July, 2010.[9]  (Tr. 11/28/2016, at p. 53).  Oak Grove acquired substantially all of the assets of MMA on February 3, 2009. (Windmill Exhibit 28).  Johnson testified that JLL acquired Oak Grove in October or November, 2015.  (Tr. 12/1/2016, at p. 100).

Johnson testified that JLL has a dual role and responsibility as both lender and servicer, because it originated the loan.  (Tr. 12/1/2016, at p. 114).  Johnson testified that Oak Grove obtained servicing rights from Midland Mortgage with

---

[8]Johnson testified that MMA acquired Midland Mortgage.  (Tr. 11/28/2016, at p. 54).

[9]In the time period between 2008 and 2010, Johnson was unaffiliated with any of the entities involved in the instant dispute.  (Tr. 12/1/2016, at p. 98-99).

respect to the loan.  (Tr. 11/28/2016, at p. 103).[10]  The court
finds this testimony not credible, because Midland Mortgage had
previously executed an assignment of all of its interest in the
loan to Fannie Mae.  See Section C. 4., above.  The court finds
that Oak Grove pursued whatever actions it took with respect to
Debtor, on behalf of Fannie Mae, under its servicing agreement
(which is not in evidence), and not under any independent right
to do so pursuant to its acquisition of Midland Mortgage.

     Fannie Mae added further confusion to the roles, as
between Fannie Mae and Oak Grove, with respect to Debtor's loan.
Notwithstanding that the loan documents identify the holder of
the note, Fannie Mae, as the lender, Noakes testified that Oak
Grove is the lender, and that Fannie Mae is the "noteholder."
(Tr. 11/1/2016, at p. 34).

     The court finds that, at all times pertinent to the
disputes in the instant adversary proceeding and 506(b) motion,
Fannie Mae has been the lender identified in the loan documents,
and Oak Grove has been Fannie Mae's servicer and agent.

     E.   Prepetition Course of Dealing Among the Parties

          1.   Prior to Pre-Negotiation Letter

     Fonseca testified that Debtor employed Capstone
Property Management ("Capstone") as the property management

---

     [10]Johnson testified that Oak Grove services multiple loans
for Fannie Mae.  (Tr. 11/28/2016, at p. 103).

company of the apartment complex for several years prior to the
date of filing of the bankruptcy petition, including in 2010.
(Tr. 11/18/2016, at p. 58).

Johnson testified that he conducted annual inspections
of the property for Oak Grove. (Tr. 11/28/2015, at p. 145). He
testified that he made his first visit to the property when he
was employed by MMA in 2006. He testified that the property was
in reasonably good condition in 2006. (Tr. 12/1/2016, at p. 110).

Johnson testified that, during 2010, there was a
problem with a lift pump station. (Tr. 11/29/2016, at p. 111).
Johnson testified that a lift pump station pumps sewage from a
lower to a higher elevation, and reduces solid waste to a liquid
form before it enters the city's sewer system. (Tr. 11/29/2016,
at p. 19).

Diana Romero, a district manager with Capstone,
requested an advance from the Replacement Reserve to replace the
lift pump station. The request was transmitted to Amie Hadder at
Oak Grove. Hadder forwarded the request to Renee Trinkaus, also
at Oak Grove. Email correspondence between Hadder and Trinkaus
dated December 2, 2010 indicates that the amount requested was
$3,983.43, and that the balance in the Replacement Reserve was
$56,249.87. (Windmill Exhibit 29). Johnson testified that he
does not know whether Oak Grove issued any payments based on the
2010 request. (Tr. 11/29/2016, at p. 111).

24

In 2012, more serious questions arose regarding the operation and financial condition of the property. In an email dated April 25, 2012, from Michael Cerio, an asset manager at Oak Grove, to Brenda Crawford, at Capstone, Oak Grove requested an update as to issues regarding parking lot resealing and striping, trim painting, roof stains, tree trimming, and cracked asphalt sidewalks. In the email, Cerio recites that he is "following up on the last inspection that was done at Windmill Run." (Defendants Exhibit 17). Johnson, in his testimony, did not state that he was the one who had inspected the property in 2012. Instead, he cited to Cerio's letter. (Tr. 12/1/2016, at p. 121).

On May 23, 2012, Cerio notified Romero and Crawford that an order would be placed for a Physical Needs Assessment ("PNA") pursuant to the RRSA. (Windmill Exhibit 32).

The front page of what purports to be the 2012 PNA prepared by f3, Inc. ("f3"), bears a "report date" of June 15, 2012, and identifies the f3 project number as 12.0246. On page three, f3 states that it conducted a survey of the property on June 11, 2012. On page four, f3 identifies repair items with cost estimates totaling $94,170. None of the items in the 2012 PNA were identified as "life safety issues." Beginning on page six, there is a table purporting to identify the items which comprise the $94,170. The items identified are removing dead trees, making several asphalt and pothole repairs, sealing and

25

restriping the parking lot, and replacing the asphalt sidewalks with concrete.  The largest line items are the sidewalk replacement ($60,000) and the tree removal ($17,000).  In contradiction of the front page, the table identifies the f3 project number as 12.0124.  It also identifies the property as "The Springs;" states that the date of assessment is April 4, 2012; and that the date of the report is April 24, 2012. (Defendants Exhibit 18).  The court notes that April 24, 2012 is one day before the April 25, 2012 email from Cerio to Crawford requesting an update as to the status of repairs, and one month before Oak Grove notified Debtor that a PNA was to occur.  The court also notes that Windmill Run was never known as "The Springs."  The court finds that the 2012 PNA contains important inconsistencies, and is unreliable and not probative.

On October 18, 2012, Melissa Casale of Oak Grove notified Romero that, according to the 2012 PNA, Oak Grove had determined that the monthly replacement reserve deposit was sufficient to cover estimated future capital needs.  (Defendants Exhibit 19).

During May, 2012, Debtor made a request for disbursement from the Replacement Reserve, in the amount of $23,031.17.  The request covered replacement of appliances, removal of dead trees, and HVAC items.  Johnson had apparently failed to notice the inadequacies of the 2012 PNA.

Notwithstanding the October 18, 2012 letter stating that the
replacement reserve was sufficient, Oak Grove does not appear to
have responded to the May, 2012 request for disbursement prior to
February, 2013.  By email dated February 26, 2013, Johnson
notified Crawford and Jennifer Walker of Capstone that "there
will be no disbursements from the replacement reserve account
until we can satisfactorily resolve the outstanding deferred
maintenance issues identified in the Physical Needs Assessment
previously provided to Brenda Crawford."  (Windmill Exhibit 30).

A February 20, 2013 email from Johnson to Crawford and
Walker suggests that Johnson conducted his own inspection of the
property on that date.  In addition to the items identified in
the 2012 PNA, Johnson identified issues with missing door
hardware, appliances, water heaters, and air conditioning
compressors, as well as issues with a gutter, the lift pump
station, and the swimming pool.  Johnson estimated the cost of
immediate repairs to be $150,000.  His email demands from
Capstone by March 1, 2013 a response "regarding the cost to
repair, when work can begin, source of funding and the
anticipated completion date with all units back online."
(Windmill Exhibit 30).

Hayes testified that, beginning in 2013, Johnson's
primary concern appeared to be that the property had asphalt
paving rather than concrete for sidewalks, driveways, and parking

areas.  (Tr. 12/8/2016, at p. 99-101).

On October 16, 2013, TDHCA notified Debtor that it would conduct an inspection of the property on October 29, 2013. (Defendants Exhibit 20).  Brenna Hayes, who has been the onsite property manager since 2010, testified that TDHCA conducts its inspections every three years.  (Tr. 12/8/2016, at p. 112).

Hayes testified that Capstone wasted money and did not make funds available for needed items.  She testified that Capstone charged Debtor for uniforms for herself and the maintenance staff that were not received.  She testified that Capstone sent numerous items to Debtor by express delivery, including monthly reports prepared by Hayes, and check stubs, despite the fact that the checks had been deposited directly into the workers' accounts.  She testified that Capstone was paid for accounting services, but then hired an outside entity, at additional expense, to pay Debtor's bills.  (Tr. 12/8/2016, at p. 120).

After the October 29, 2013 inspection, TDHCA notified Debtor of several deficiencies, and, by letter dated November 20, 2013, requested that certain work be completed.  (Defendants Exhibit 21).[11]

---

[11]Johnson testified that he is aware some of the issues raised by TDHCA have been addressed.  (Tr. 12/7/2016, at p. 64). Michael Biederstadt testified that the remaining issues related to the slope and condition of the walkways.  (Tr. 12/8/2016, at p. 23-24).  Hayes testified that all of the outstanding issues

Prior to 2014, nearly all of the communications in evidence occurred between Johnson, as the asset manager for Oak Grove, and either Capstone personnel or Walther. Johnson testified that he had communicated with Walther by phone several times during 2013, regarding damage to the property and improving property operations. (Tr. 12/1/2016, at p. 148-149). Johnson testified that Walther assured him that Debtor "was looking for a resolution to the damage at the property, but that their cash situation...made it difficult for them to commit to a sizeable amount of cash to the property." (Tr. 12/1/2016, at p. 150).

Fonseca testified that, from inception of the loan, the property was not generating the cash flow that was projected pro forma. He testified that the partners made multiple advances to ensure that Debtor was able to meet its obligations, including debt service. (Tr. 11/18/2016, at p. 58). He testified credibly that Oak Grove denied multiple requests to make disbursements from the Replacement Reserve in order to address the property condition. (Tr. 11/18/2016, at p. 59-60). Fonseca testified that Breen, through his entity National Mortgage Investors, and Fonseca and Walther, through their entity American Communities, advanced approximately $1.2 million to Debtor prepetition. (Tr.

---

have been addressed. She testified that TDHCA conducted its next regularly scheduled inspection in 2016, and did not identify any remaining issues with respect to the property condition. (Tr. 12/8/2016, at p. 113-114).

11/21/2016, at p. 92).[12]

Johnson testified that, in June, 2014, he received an email from Walther referring him to Fonseca for any further communications regarding the property. (Tr. 11/29/2016, at p. 83).

Fonseca testified that, during 2014, he became more involved in discussions with Fannie Mae and Oak Grove regarding the property. Fonseca testified that he brought Breen into the discussions. Fonseca testified that Johnson was involved in the discussions on behalf of Oak Grove, and Chris Beauregard was involved in the discussions on behalf of Fannie Mae. (Tr. 11/18/2016, at p. 75).[13] Breen testified that he asked John Cichon, Breen's construction manager,[14] to visit the property and give him an assessment of the conclusions Cichon reached. (Tr. 12/12/2016, at p. 149).

_____

[12]Fonseca testified that these prepetition advances included, inter alia, $50,000 as a retainer for Debtor's counsel in the above captioned Chapter 11 case. (Tr. 11/18/2016, at p. 111).

[13]Noakes testified that Beauregard is a senior asset manager for Fannie Mae. (Tr. 11/1/2016, at p. 37). Noakes testified that Beauregard works in the Special Credits department. He testified that the Special Credits department assists the lender (the court infers that Noakes meant Oak Grove). (Tr. 11/3/2016, at p. 51).

[14]Fonseca testified that Cichon is Breen's construction manager. (Tr. 11/18/2016, at p. 79).

Fonseca testified that, in negotiating with Oak Grove and Fannie Mae beginning in 2014, he was told that a loan modification was a potential option, once the loan was removed from a pool of loans.  (Tr. 11/18/2016, at p. 61).[15]

Johnson testified that, in telephone discussions during 2013 and 2014 with Walther, he stated that there were no loan modifications available.  (Tr. 11/29/2016, at p. 80).

On November 26, 2014, the lift pump station at the property failed, resulting in the discharge of sewage onto the property.  Capstone requested a disbursement from the Replacement Reserve, in order to replace two pumps at the lift pump station and clean up the sewage.  On December 11, 2014, Johnson sent an email to Jennifer Norris of Capstone, stating that certain funds could be disbursed for the repair.  In the December 11, 2014 email, Johnson also stated:  "Please note, no other requests can be paid in 2014, and in 2015, ALL invoices submitted will need to be dated AFTER 1/1/15.  The maximum amount that can be requested in 2015 will be $13,500, 2016 $19,000 and 2017 $26,000."  On December 15, 2014, Johnson sent an email to  Norris, allowing a disbursement of $9,890 to replace the two pumps, but not allowing reimbursement of the sewage cleanup costs.  (Windmill Exhibit

---

[15]Both Noakes and Johnson testified that the note was held at that time in a pool as part of an MBS (mortgage-backed security) trust.  (Tr. 11/1/2016, at p. 32; Tr. 11/28/2016, at p. 138).  Fannie Mae subsequently repurchased the note out of the MBS trust.  (Tr. 11/1/2016, at p. 32).

35).

On November 26, 2014, the same date on which the lift pump station failed, Johnson emailed Fonseca regarding the asphalt at the apartment complex. Fonseca responded that the work was delayed "in order to try and generate some additional cash at the property." Johnson replied, stating a need "to have a discussion regarding the issues at the property and a firm timeline on addressing the outstanding issues." (Defendants Exhibit 37).

Breen testified that his understanding of Fonseca's response was that Debtor was raising additional cash from Breen, rather than from operations. (Tr. 12/12/2016, at p. 160).

Johnson testified that he had a telephone conversation with Breen after November 26, 2014, and before January 20, 2015, regarding a supplemental loan to finance the completion of repairs. (Tr. 12/5/2016, at p. 21).

On January 20, 2015, Johnson emailed Debtor's principals, stating that neither Fannie Mae nor Oak Grove would provide a supplemental loan. (Defendants Exhibit 37).

Breen testified that he had a telephone conversation with Johnson and Cichon on January 20, 2015. (Tr. 12/14/2016, at p. 30-31). He testified that he and Cichon discussed with Johnson a different basis for completion of the work. (Tr. 12/14/2016, at p. 33). Breen testified that Cichon reported to

32

him a number of bids obtained by Capstone, for a scope of work identified by Capstone in coordination with Johnson.  He testified that the aggregate amount of the bids was approximately $200,000.  (Tr. 12/12/2016, at p. 150-155).

On January 27, 2015, an email exchange took place between Fonseca and Johnson.  Fonseca stated that he had a call in to Breen to discuss Johnson's January 20, 2015 email.  Johnson replied to the email, stating that he had had the January 20, 2015 conversation with Breen and Chicon.  In his email, Johnson outlined what he believed were key points:

> 1) Neither Fannie Mae or Oak Grove Capital is in the position to assist with supplemental financing in order to complete the repairs at Windmill Run
>
> 2) Ownership is discussing the possibility of pursuing a Qualified Contract for the sale of the property. Based on a cursory review of the documents, it appears the option chosen has several intermediate time frames for a specific type of qualified buyer to purchase.  If I read this correctly, the process could be up to 2 years, but cannot start until AFTER the 15th year of the compliance period.
>
> 3) As a team, the source of funds for the repairs still needs to be determined, but will need to be addressed soon.  I still believe with a sign that improvements are coming to the property, management will be able to increase the street rents by 15% from the current levels and increase renewal rates at a more measured pace.  These revenue improvements should provide the opportunity to show the capabilities of the property and enhance the ability to refinance the property, recoup some advances, finish improvements and increase Net Cash Flow which ultimately flows to the partnership.

(Defendants Exhibit 37).

Breen testified that, in the January 20, 2015 conversation, he disagreed with the reports regarding paving and asphalt.  He testified that his primary concern regarding the January 20, 2015 conversation was that there were 18 vacant units, and that he intended to make a cash infusion in order to "begin turning those units and getting them available for rent." He testified that he said during that conversation that he believed discussions would continue regarding the cost of repairs.  (Tr. 12/12/2016, at p. 164-165).

### 2.   First Pre-Negotiation Letter

On February 4, 2015, Johnson sent an email to Debtor attaching a proposed form of pre-negotiation letter ("PNL"). (Defendants Exhibit 39).  Fonseca and Walther signed the February PNL on February 12, 2015.  (Defendants Exhibit 40).  Although the letter is on Oak Grove letterhead, Johnson testified that a PNL is a Fannie Mae form letter.  (Tr. 11/29/2016, at p. 59).  The February PNL provides in pertinent part:

> Dear Mr. Fonseca & Mr. Walther:
>
> You have asked on behalf of Borrower to meet with the undersigned in order to discuss the problems associated with this loan.  In order for any meeting to be effective, enclosed is a list of information we require for analysis of the loan.  As we will need some time to analyze this information, the information must be received by us on or before the close of business on March 6, 2015.

* * *

None of the oral or written discussions or other communications relating to the Loan, to its terms or provisions, or to efforts to resolve any problems associated with the Loan and the Loan Documents shall be effective to modify, extend or amend in any manner, the rights and remedies of Fannie Mae under the Loan Documents.  Each term and provision of the Loan Documents shall be fully enforceable in accordance with its terms.

\* \* \*

Also, if Fannie Mae, in its sole and absolute discretion, deems circumstances to so warrant, Fannie Mae's policy is to pursue "parallel paths," whereby it pursues its rights and remedies under the loan Documents while at the same time discussing the loan. Accordingly, Fannie Mae reserves any and all rights and remedies it may possess at law or in equity.  By scheduling this meeting, and exchanging communications related to the Loan and the Loan Documents, neither Fannie Mae nor Servicer (I) waive any rights they may have which arise from the Loan Documents or the actions or inactions of Borrower; or (ii) agree to refrain from or delay the exercise of any of Fannie Mae's rights or remedies under the Loan Documents.

\* \* \*

Pursuant to the foregoing, we are willing to hold these discussions with you upon the following terms and conditions:

\* \* \*

1.  Rights and Remedies Not Affected.  Borrower hereby acknowledges that Fannie Mae is entitled to exercise any and all rights and remedies set forth in the loan Documents in accordance therewith, at law or in equity. Fannie Mae's rights and remedies shall not be affected or impaired in any way by reason of any or all of the following: (I) holding discussions with Borrower; and (ii) exchanging any correspondence among the parties. Any and all of the foregoing shall not be deemed to act as a waiver of, or otherwise preclude, the exercise of any rights or remedies of any of the parties under the Loan Documents or at law or equity, or from commencing or continuing the exercise of such rights or remedies.

2.  <u>No Oral Modifications</u>.  No modification, extension, or amendment agreement arising out of any discussions or correspondence pertaining to the loan or Loan Documents shall be effective or binding unless in writing in a form approved by Fannie Mae.  Each and every oral agreement to modify, extend or amend the terms and provisions of the Loan Documents is entirely unenforceable, and Borrower hereby waives any reliance on (I) any and all oral agreements to modify, extend or amend the terms and provisions of the loan Documents and (ii) the matters, conditions, or events related to any and all such oral agreements to modify, extend or amend the Loan Documents.

\* \* \*

5.  <u>Termination of Discussions</u>.  Borrower or Fannie Mae may, in its sole and absolute discretion, unilaterally discontinue the discussions at any time for any reason without any liability whatsoever to the other party by reason of any such discontinuation or termination.

6. <u>Loan Documents</u>.  Borrower acknowledges that each of the Loan Documents is valid, fully enforceable in accordance with its terms, and evidences legal and binding obligations which are in full force and effect.

7.  <u>Authorized Representatives</u>. Christopher Beauregard is authorized on behalf of Fannie Mae and Bill Johnson is authorized on behalf of Servicer to hold discussions with you.  In connection with the scheduling of the meeting, we must be advised by Borrower as to the identity of their respective authorized representatives. Such authorization remains in effect until changed in writing by the applicable party.

8.  <u>Lender Relationship; Participation: Credit Loss Insurance</u>.  Borrower acknowledges that Fannie Mae is the holder of the note executed in connection with the loan and that the Servicer is servicing the Loan under its lender/servicer agreement with Fannie Mae. Borrower further acknowledges that although Fannie Mae may be the sole holder of the note, other parties such as Servicer, loan participants. credit loss insurance, REMIC, or other mortgage investors, may share in the losses incurred on the loan; however, such agreements and relationships, if any, are between Fannie Mae and such third parties, and Borrower is neither a party to,

nor a beneficiary of, any such agreements or
relationships.

(Defendants Exhibit 40).

Fonseca testified that he and Walther signed the
February PNL, operating under the assumption that they were
working productively with Fannie Mae and Oak Grove to reach a
mutually agreeable solution on the issue of the maintenance
items.  (Tr. 11/18/2016, at p. 64).

Despite the appearance that Fannie Mae and Oak Grove
were engaging in formal good faith negotiations through the
issuance of the February PNL, they had an ulterior motive in
doing so.  On February 3, 2015, one day prior to the issuance of
the February PNL, Johnson emailed Kevin Sullivan and Hunter
Atteberry,[16] stating:

> I received another request from the Borrower last night
> asking for some type of modification.  This is an MBS
> deal, so no options available.
>
> I discussed with Chris Beauregard this morning and
> Chris agreed with my course of action.  Based on a
> recent conversation it is possible there has been a
> transfer of the LP interest in this deal.  Because of
> this possibility, the PNL will allow us to determine if
> this occurred and will afford us the opportunity to
> create a demand for funding of all deferred maintenance
> issues.  Based on recent opinions from Fannie, the cure
> period must be offered before recourse is activated.
> In order to avoid recourse, they will need to fund

---

[16]Johnson testified that Sullivan is Johnson's boss, the
director of servicing for Oak Grove.  (Tr. 11/28/2016, at p.
161).  Johnson testified that Atteberry is the deputy chief asset
manager for Oak Grove, one of Johnson's peers.  (Tr. 11/29/2016,
at p. 35).

> approx. $300K for deferred maintenance.
>
> Any thoughts on the letter?  The 2 KPs are listed,
> however, Mark Breen has identified himself as the only
> person with money as a limited partner.  That is the
> term that leads me to believe there has been a
> transfer.

(Windmill Exhibit 37).

Johnson testified that he believed there had been a transfer of the limited partner's equity interest to Breen.  (Tr. 11/29/2016, at p. 45).  He testified that he believed the transfer possibly triggered recourse liability against Debtor's principals.  (Tr. 11/29/2016, at p. 46).  He testified that he now has no recollection of the conversations in January, 2015, or in February, 2015 leading up to the issuance of the February PNL.  (Tr. 11/29/2016, at p. 43-44).

Johnson testified that the opportunity he believed was afforded to Fannie Mae and Oak Grove based on what he believed to be a transfer of the limited partner's equity interest was to trigger recourse liability against Debtor's principals.  (Tr. 11/29/2016, at p. 50-51).[17]

Johnson testified that the recourse liability against Debtor's principals created leverage for Fannie Mae and Oak Grove to negotiate a better position as against Debtor and its

---

[17]Fannie Mae subsequently filed suit against Fonseca and Walther in the United States District Court for the Southern District of Texas, on December 30, 2015, in C.A. No. 3:15-cv-00359.  The suit was dismissed on May 10, 2016.

principals.  (Tr. 11/29/2016, at p. 56).

      3.  <u>The Push Toward Foreclosure</u>

      Seeing an opportunity not only to trigger recourse liability against Debtor's principals but also to obtain the property free of the LURA, Fannie Mae and Oak Grove manufactured an opportunity to foreclose.  If they foreclosed, the property would no longer be held to rents for low and middle income tenants.  Oak Grove or Fannie Mae, or their successor, could charge market rents.  Despite the fact that the RRSA provides for Fannie Mae to perform a PNA only between the sixth month and the ninth month of the tenth year after execution of the RRSA (see Defendants Exhibit 3), Fannie Mae commissioned the preparation of a "Property Condition Assessment" ("PCA") by f3.  The PCA report is dated March 23, 2015, and states that the date of the assessment was March 11, 2015.  (Windmill Exhibit 42).  The date on which the March PCA was actually commissioned is not in evidence.

      Johnson testified that the terms "Physical Needs Assessment" and "Property Condition Assessment" are used interchangeably.  (Tr. 11/30/2016, at p. 80).  That testimony is self-serving (if the March PCA was a PNA under the loan documents, it would appear to trigger the adjustment of the Replacement Reserve under the RRSA for the remainder of the loan term in an amount sufficient to make the required repairs) and is